*State of Maryland v. Lamont Smith*, No. 30, September Term, 2023, Opinion by Booth, J.

**ADMISSION OF HEARSAY EVIDENCE UNDER DECLARATION AGAINST PENAL INTEREST**—The Supreme Court of Maryland has established a process for admitting certain types of hearsay statements that fall within a particular hearsay exception that is commonly known as the "declaration against penal interest." *State v. Matusky*, 343 Md. 467 (1996). Under that process, when a proponent seeks to admit presumptively inadmissible hearsay statements that comprise an extended narrative or interview, a trial court must conduct a "parsing analysis" in which the court must break down the narrative and determine the separate admissibility of each single declaration or remark. The test for admissibility that the trial court must apply "to each statement within a declaration is whether a reasonable person in the declarant's circumstances would have believed the statement was adverse to his or her penal interest at the time it was made." *Id.* at 492. A trial court may not simply admit the extended narrative or interview *in toto* without determining that each statement contained therein was self-inculpatory as to the declarant.

**PRESERVATION FOR APPELLATE REVIEW**—Where the State sought to admit a 55-minute interview by law enforcement of an individual under the declaration against penal interest exception to the hearsay rule under Maryland Rule 5-804(b)(3), and the trial court failed to undertake the parsing process required by Maryland case law in order to admit this particular type of hearsay evidence, defense counsel sufficiently preserved the defendant's objections for appellate review.

Circuit Court for Wicomico County
Case No.: C-22-CR-19-000554
Argued: May 6, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 30

September Term, 2023

STATE OF MARYLAND

v.

LAMONT SMITH

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Hotten, Michele D.
    (Senior Justice, Specially Assigned),


JJ.

Opinion by Booth, J.
Biran, J., dissents.

Filed: August 13, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This Court has established a process for admitting certain types of hearsay statements that fall within a particular hearsay exception that is commonly known as the "declaration against penal interest." *State v. Matusky*, 343 Md. 467 (1996).[1] Under that process, when a proponent seeks to admit presumptively inadmissible hearsay statements that comprise an extended narrative or interview, a trial court must conduct a "parsing analysis" in which the court must break down the narrative and determine the separate admissibility of *each single declaration or remark*. The test for admissibility that the trial court must apply "to each statement within a declaration is whether a reasonable person in the declarant's circumstances would have believed the statement was adverse to his or her penal interest at the time it was made." *Id.* at 492. A trial court may not simply admit the extended narrative or interview *in toto* without first determining that each statement contained therein was self-inculpatory as to the declarant.

The trial court's analysis of each statement "can be a fact-intensive inquiry," which requires careful examination of all the circumstances surrounding the criminal activity involved.[2] This may be especially true when a proponent seeks the admission of an extensive narrative or interview containing many individual statements.

---

[1] Although *Matusky* is our most recent case on this topic, as discussed herein, we first addressed the parsing analysis in *State v. Standifur*, 310 Md. 3 (1987). And thereafter, the United States Supreme Court adopted a similar approach for admitting this type of hearsay evidence under the federal rules of evidence in *Williamson v. United States*, 512 U.S. 594 (1994). In *Matusky*, we adopted *Williamson* and reconciled it with *Standifur*.

[2] *Williamson*, 512 U.S. at 604 (cleaned up).

In this case, the State sought to admit law enforcement's extensive interview of Mr. Tony Blake (the "Blake Interview") as a declaration against penal interest in the criminal trial of the Respondent, Mr. Lamont Smith. The interview is 55 minutes long, contains approximately 250 questions from law enforcement to Mr. Blake, and Respondent is mentioned or referenced approximately 88 times. In seeking its admission, the State acknowledged that some statements contained in the Blake Interview were inculpatory solely as to the Respondent. However, the State urged the trial court to admit the Blake Interview in its entirety because the statements "were so interwoven" that they could not be separated. At the pre-trial hearing, defense counsel objected on several grounds, including disputing that all of the statements were self-inculpatory to Mr. Blake. Defense counsel also disagreed with the State's "interwoven" theory of admissibility.

After hearing arguments of counsel, the circuit court ruled that the entirety of the Blake Interview was admissible. In doing so, however, the court failed to conduct the parsing analysis required by *Matusky*. Instead, it treated the interview as a single statement and ruled that it was admissible as a declaration against penal interest. Thereafter, the Blake Interview was admitted at trial and published to the jury over defense counsel's objection. Respondent was found guilty on multiple charges involving possession and conspiracy to distribute controlled dangerous substances ("CDS").

On appeal, Respondent argued that the trial court erred in admitting the entire Blake Interview without undertaking the admission process required by *Matusky*. The State maintained that the Appellate Court could not consider Respondent's argument because defense counsel did not identify, and request specific redactions of, the

2

inadmissible statements contained within the interview. The Appellate Court rejected the State's argument and determined that Respondent had adequately preserved his objection to the trial court's failure to undertake the process required by *Matusky*. *Smith v. State*, 259 Md. App. 622 (2023). That court held that the trial court erred in admitting the entire Blake Interview into evidence, and vacated Respondent's convictions. *Id.* at 673.

We granted the State's petition for writ of *certiorari* to answer one question: whether the Appellate Court erred in holding that Respondent adequately preserved his objection to the trial court's failure to undertake the process required under *Matusky* for the admission of this particular type of hearsay evidence. For the reasons set forth herein, we hold that the Appellate Court did not err. On the record before us, we determine that Respondent made sufficient objections to preserve his argument that the trial court failed to undertake the process for admission that is unique to this particular type of hearsay evidence.

# I

## Background

In the early morning hours of August 9, 2019, law enforcement raided a home in Salisbury, Maryland on suspicion that it was housing a drug trafficking operation. Upon entering the home, officers discovered, among other things, a large amount of CDS, and arrested the residents of the home, Mr. Blake and Mr. Dwight Woods. They also arrested Respondent, who claimed he was an overnight guest.

For approximately one month prior to the raid, the home had been placed under surveillance after receiving information that it was being used for heroin sales. Detective

Michael Kirkland,[3] working undercover, made four purchases of CDS from Mr. Woods in July and August 2019.

The State charged Respondent in a 42-count indictment with various drug related offenses, including counts of being a drug kingpin to distribute heroin and fentanyl; counts of conspiracy to possess and distribute large amounts of heroin, fentanyl, cocaine, and alprazolam; and one count of unlawful possession of ammunition. The State also brought charges against Mr. Woods but not against Mr. Blake, who was terminally ill and required medical care and supervision. Respondent was acquitted or found not guilty of 30 counts, including all of the drug kingpin charges, but he was convicted of counts for possession and conspiracy to possess heroin, fentanyl, cocaine, and alprazolam. The court sentenced Respondent to an aggregate of four years in prison in May 2022.

### A. The Blake Interview

Sergeant Tyler Bennett and Sergeant Jordan Banks[4] conducted an interview of Mr. Blake at his home on August 27, 2019—18 days after the raid. At Respondent's criminal trial, a redacted version of the Blake Interview was played and published to the jury over the objection of defense counsel. The State explained at trial that the recording was "not the full continuous interview" because the State had excised portions that it believed "wouldn't have been relevant[.]" Defense counsel agreed that "[t]he stuff [the State]

---

[3] Detective Kirkland is with the Ocean City Police Department's Narcotics Unit. Ocean City's task force assisted the Wicomico County Sheriff's office "as needed" for undercover police work.

[4] As of July and August 2019, Sergeant Bennett and Sergeant Banks were employed by the Wicomico County Sheriff's Office.

redacted was stuff that really legitimately, it just shouldn't come in because it just had nothing to do with this[,]" but maintained that he did not think "any of it is relevant."

Sergeant Bennett and Sergeant Banks began the conversation by telling Mr. Blake that they wanted to talk to him about the case that he was "involved in as a co-defendant[.]" Mr. Blake was seated and wearing nothing but a blanket. The interview was recorded on the body camera of one of the officers. The officers informed Mr. Blake that the interview was being recorded and read him his *Miranda* rights. Mr. Blake confirmed that he understood those rights and verbally waived them because he was physically unable to sign a statement.

The interview is difficult to follow because of Mr. Blake's declining health, his generic use of the word "him" to refer to both Respondent and Mr. Woods, and the fact that Mr. Blake was describing the drug distribution operation at different points in time without clarifying the time frame to which he was referring. What is very clear, however, is that the officers' primary purpose in conducting the interview was to obtain information pertaining to Respondent's involvement in the drug operation. Throughout the interview, the officers repeatedly redirected Mr. Blake to questions involving Respondent's participation in the criminal enterprise. In total, over the course of the approximately 55-minute interview, the officers and Mr. Blake made approximately 88 references to "Mont" or "Lamont" on the redacted version of the Blake Interview that was introduced by the State.[5]

---

[5] Respondent is referred to as "Lamont" and "Mont" in the interview.

5

The very first question the officers asked Mr. Blake was: "[s]o what's going on with Mont?" One officer asked, "[w]hose stuff is it in the house - - that was in the house?" to which Mr. Blake replied, "[t]he boy, Shamir[,]"[6] referring to Mr. Woods. Mr. Blake repeatedly asserted that the drugs seized on the day of the raid belonged to Mr. Woods, and that Mr. Woods "leaves late at night" and "[b]rings it down"; whereas Respondent's "involvement" was that "[h]e just knows about it." Mr. Blake stated that "[a]t first" he worked for Respondent, but that Respondent "fell back because he's ready to start a family with his wife and get married."

The officers asked Mr. Blake about the operational details of the drug enterprise when he first became involved. According to Mr. Blake, for a period of "[c]lose to a year," Respondent provided him with a cell phone. Mr. Blake's duties were to answer the phone, arrange deliveries, and drive to meetings where he would exchange drugs for money. Respondent lived near Baltimore City and would visit Salisbury a few times a week. During these visits, Mr. Blake would give Respondent the proceeds from the drug sales, less expenses and his salary, and Respondent would supply Mr. Blake with new drugs that were prepackaged and ready for sale.

Mr. Blake explained that in recent months, he turned money over to, and accepted new drugs from, Mr. Woods, rather than from Respondent. Mr. Blake stated that because of his deteriorating health, and the fact that he had become "too slow," Mr. Woods had "demoted" him to having almost no role in the enterprise. Mr. Blake stated that, within

---

[6] Throughout the interview, Mr. Woods is referred to as "Shamir" and "Samir."

6

the last two months before the raid, Respondent would visit to "take care of [him]" and to "take [him] to the hospital" for medical treatment, and that this was his only interaction with Respondent.

Despite being cooperative throughout the interview, Mr. Blake's answers were often unintelligible, and his narrative was confusing, which prompted the officers to say, "it doesn't make any sense[,]" or "your story makes no sense":

[SGT. BENNETT]: But how much did he give you at a time here to sell; is what I'm asking?

MR. BLAKE: Which one?

[SGT. BENNETT]: Lamont.

MR. BLAKE: Like 15.

[SGT. BENNETT]: So he came daily because you said you sold ten a day rough sometimes.

MR. BLAKE: No. He would - - when he come down on the weekends, that's when he would bring to me. But whenever the boy, Shamir, had, was already down here.

[SGT. BENNETT]: Was already stored here?

MR. BLAKE: I don't know where he had it at.

[SGT. BENNETT]: So it doesn't make any - - it doesn't make any sense.

MR. BLAKE: I told the dude it's over at Pemberton (phonetic) somewhere but I don't know where.

[SGT. BENNETT]: So he would bring 15 - - it doesn't make any sense. Who - - so - - how does the organization work? Who's in charge?

7

MR. BLAKE:        The boy, Shamir, has the stuff.  Mont knows the people.

[SGT. BENNETT]: Okay.

MR. BLAKE:        When he brings it down, he takes it to Pemberton but I don't know which - -

[SGT. BENNETT]: So Mont takes it to Pemberton?

MR. BLAKE:        No, the boy - -

[SGT. BANKS]:    So Samir is his transportation?

MR. BLAKE:        - - (indiscernible) - - he's claiming that he's - - Shamir has the stuff.

[SGT. BENNETT]: This whole conversation makes zero sense.  I'm getting -

* * *

[SGT. BENNETT]: I'm getting - - I'm getting a little bit frustrated.

The lack of clarity in Mr. Blake's responses was heightened by the officers' attempts to redirect him from the manner in which the enterprise had worked in the past to the present operations.  For example, as reflected in the above-described exchange, immediately after Mr. Blake explained the salary he earned from the Respondent at the beginning of the enterprise, one of the officers asked Mr. Blake to clarify "how does the organization work?  Who's in charge?"  Mr. Blake responded, "[t]he boy, Shamir, has the stuff.  Mont knows the people."  In another instance, Sergeant Banks redirected:

[SGT.] BANKS:    Mont called the shots and then when you started your - - what happened when your medical health went down?  Who took over your spot when your health went down south.  When your health started getting bad?  Who took your spot?

8

[MR. BLAKE:]       Shamir.

[SGT.] BANKS:      Okay.

[MR. BLAKE:]       I mean, he's the one that's been bringing down.

[SGT.] BANKS:      He's been transporting it for Mont down here.

MR. BLAKE:         Yeah.

[SGT.] Banks:      Okay.

[SGT. BENNETT]:    So Mont - - so what I'm asking is, Mont's still at the top.

MR. BLAKE:         No, he dropped out because he's getting ready to get married.

Mr. Blake then continued to clarify that, previously, Respondent "was top[,]" but "He dropped down.  Samir took over" because Respondent was getting married and "[s]o he said he wasn't going to do nothing else."  Sergeant Bennett then asked:

[SGT.] BENNETT: How long ago was that?

MR. BLAKE:         I was demoted.

[SGT.] BENNETT: How long ago was that?

MR. BLAKE:         What?  That Shamir took over?

[SGT. BENNETT]: Uh-huh.

MR. BLAKE:         The trip was like one (indiscernible) the plans for the trip.  So it's been about two and half, three months.  Just before this.

[SGT. BENNETT]: Well, this was only - - this was less than a month ago.  This was only three weeks ago.

9

Sergeant Bennett continued to press Mr. Blake about Respondent's role in the enterprise, and eventually narrowed his questions to the few weeks leading up to the raid—during the time in which the house was under surveillance. However, Mr. Blake appeared unable to follow the questions:

[SGT. BENNETT]: Okay. But you know that Mont and Samir and you, up until a few weeks ago, all sold heroin, correct?

MR. BLAKE:       No. I stopped.

[SGT. BENNETT]: Up until a few weeks ago, you all sold heroin, correct? So it shouldn't be that big of a surprise if there was heroin when a search warrant was done on Samir and Mont.

MR. BLAKE:       No. What I'm saying is I didn't know it was here because Mont was saying he was leaving to go out of town.

[SGT. BENNETT]: I get that.

In the State's motion to admit the interview at trial, the State noted that "[a]t the conclusion of the interview, Mr. Blake suffered a health complication and was transported to the hospital in an ambulance."

### B.   *The State's Motion to Admit the Blake Interview*

The State filed a motion to introduce the Blake Interview based upon Mr. Blake's unavailability under Md. Rule 5-801(a)(4) due to his "failing health," explaining that it would be "infeasible to transport Mr. Blake to court from his assisted care facility." The State argued that the Blake Interview, although hearsay, should be admitted under Maryland Rule 5-804(b)(3) as a "statement against interest," because it "so tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the

10

declarant's position would not have made the statement unless the person believed it to be true." The State contended that Mr. Blake's testimony was "material" to Mr. Smith's prosecution. The State also argued that "Mr. Blake's statement is undoubtedly against his penal interest[]" and that "a reasonable person in his situation would have perceived his statements to be against his interest at the time." The State further contended that the "corroborating circumstances clearly indicate the trustworthiness of the statement," and that extrinsic evidence supported "Mr. Blake's telling of events."

In its written motion, the State acknowledged that the court was required to "parse the whole of the statement into its individual, inculpating parts, and other such closely related collateral statements[.]" (Citing *State v. Matusky*, 343 Md. 467 (1996)). However, the State claimed that "the statements that contain inculpating statements relating to Mr. Blake are so interwoven with the statements that inculpate [Respondent] that they cannot be severed." The State further contended that the "collateral portions of the statement that are so closely related to the inculpating excerpts" were "equally trustworthy" such that they were "correspondingly admissible" under Rule 5-804(b)(3).

Defense counsel filed a response opposing the admission of the Blake Interview into evidence. Defense counsel first contended that the State failed to prove that Mr. Blake was unavailable. Defense counsel also argued that the claimed "interwoven" statements were not against Mr. Blake's interest and criticized the prosecution for "attempting to . . . get statements made by [Mr. Blake] that implicate [Respondent] into evidence as if they are statements against interest." The defense also parsed one of Mr. Blake's statements to illustrate that the statements were not "so interwoven" and were

11

indeed severable and inadmissible: "For instance, if the witness made a statement that he sold $1,000 worth of [h]eroin a week and that heroin was supplied to him by the defendant, the statement against interest is the witness selling heroin and making . . . $1,000, not that the defendant provided it to him."

Defense counsel also pointed out that the statement was vague as to the relevant timeline of events and that counsel would not have the opportunity through cross-examination to show the jury that Mr. Blake was "lessening his involvement in an attempt of not getting charged in this case at the expense of" Respondent.

The court held a hearing on the State's motion on September 14, 2020. At the hearing, the court asked whether the entire statement was against Mr. Blake's penal interest, stating, "the issue here is the part of the statement – I mean part of the nuance here is the part of the statement that implicates [Respondent], not the statement where, in effect, [Mr. Blake] implicates himself, correct?" The prosecutor agreed that "there are definitely parts of the statement that are . . . solely against [Respondent's] interest," but argued that "in a lot of portions of the interview . . . the statement is against both their interests simultaneously and they are so interwoven that you couldn't possibly separate the two."

In arguing for admission of the entire interview, the prosecutor relied upon Justice Scalia's concurrence in *Williamson v. United States*, 512 U.S. 594, 605–07 (1994).[7] The prosecutor noted that, as in that case, Mr. Blake was "describing the drug trafficking

---

[7] We discuss *Williamson v. United States*, 512 U.S. 594 (1994) in detail *infra*.

organization in excruciating detail.  And when you are not the controller or the top level of the drug trafficking organization and you describe its inner workings you necessarily must inculpate other individuals and that is what occurred[.]"

The State recognized that "[t]he issue predominantly that Your Honor has to parse out is to whether or not the statements are solely against [Mr. Blake]'s interest.  And when they implicate [Mr. Smith] they are not so divorced from those statements, and I don't think they are divorced.  I think in the majority of the spots in the interview the part where the declarant, Mr. Blake, inculpates himself cannot be divorced from his statements inculpating [Mr. Smith]."  Again invoking *Williamson*, the State argued that "[j]ust because you name somebody else for doing wrong doesn't, as Justice Scalia said, magically transform it into something that is not admissible."

The State identified examples of evidence that it intended to submit at trial to corroborate the statements in Mr. Blake's interview, including that: (1) an "undercover officer did four controlled buys" with Mr. Woods, one of which was allegedly arranged by an individual who identified himself as "Mont," which corroborated Mr. Blake's assertion that Respondent was still involved after Mr. Woods had taken over the operations; (2) Mr. Woods stated that he traveled out of town to obtain more narcotics, which "corroborate[d] what Mr. Blake said" about Mr. Woods being the one who brought the drugs to Salisbury; and (3) "[t]he car utilized to conduct the undercover buys of [CDS] belong[ed] to Mr. Blake," which was consistent with Mr. Blake's statement that Mr. Woods used his car to complete the transaction.

At the hearing, defense counsel continued to object to the Blake Interview coming into evidence. Defense counsel challenged the prosecution's assertion that Mr. Blake's statements were self-inculpatory and attacked the overall trustworthiness of the Blake Interview on the basis that it was so "ambiguous" and "confusing" as to not be probative. Defense counsel argued that the events described by Mr. Blake were unconnected to a timeframe and described in a sequence in which "Mr. Woods took over the drug operation from" Respondent, who "got out of the business when he got engaged" and was "no longer doing it[.]" Defense counsel asserted that cross-examination of Mr. Blake would be necessary to sort out the timeframe, particularly as to when Respondent withdrew from the organization, stating: "I have no concept of if [the events described] happened a week before, if that happened three months before, [or] if that happened a year before. . . . If I had the ability to cross-examine [Mr. Blake,] we might very well find out that that happened a year ago."

Referring to the statements in the Blake Interview, defense counsel also disputed the "State's argument that it is so interwoven, [Mr. Blake's] own inculpating himself and his inculpating my client[,]" as to be admissible under the declaration against interest exception.

The court asked defense counsel if he considered the Blake Interview to be exculpatory of Respondent. Counsel admitted that "I spent a lot of time going back and forth as to whether I should just allow this in," but explained that overall, the interview was problematic because of the confusing timeframes.

After hearing arguments of counsel, the court granted the State's motion to admit the Blake Interview into evidence as a declaration against penal interest. The court had no trouble determining that Mr. Blake was unavailable.[8] The court stated that "the bigger question is whether under 5-804(b)(3) his statement should be admissible at trial." In explaining its ruling, the court stated:

> I don't question whether or not his statement is a statement against interest, I also don't necessarily question the reliability of it. I do think the sort of interesting segue obviously is obviously whether or not that statement that then ties in [Respondent] should be admissible at his trial . . . . I have looked, I know my law clerk has looked, I think the State and [defense counsel] have looked to find a Maryland case on point and I don't think any of us have been successful. [The State] cited to the *Williamson* case, which I have not reviewed for this case but I have reviewed previously. The Court would note that Justice Scalia's concurrence does seem to be on point. So the Court is going to grant the State's request to allow the statement to be heard.

### C.    *Jury Trial*

Respondent's jury trial occurred over two days in April 2022. Given that the only issue before us pertains to the State's assertion that the Appellate Court incorrectly decided a preservation issue, we provide only a cursory overview of the evidence for context.

Detective Kirkland testified that, as an undercover officer, he made four controlled purchases of heroin from Mr. Woods in July and August 2019. He initiated the first

---

[8] The circuit court explained that "in my review of [Mr. Blake's] health conditions or his physical condition on the video as well as [the assistant state's attorney's] proffer of [Mr. Blake's] current physical condition, as well as the list of the medical conditions that he's suffering from as well as his placement in the assisted living sort of facility indicate his unavailability for trial."

transaction by calling a phone number and arranging the purchase with Mr. Blake and Mr. Woods. The purchase occurred in a bathroom at a grocery store. For the second purchase, Detective Kirkland called the same phone number, but this time a "different male" answered the phone and said that "his name was Mont," and instructed him to call a different number for Mr. Woods. Detective Kirkland called the number and arranged a purchase from Mr. Woods inside Detective Kirkland's car at a nearby gas station. Thereafter, Detective Kirkland arranged two more purchases with Mr. Woods.

Sergeant Bennett testified concerning the investigation into the drug operation and identified the targets of his investigation as Mr. Blake, Respondent, and Mr. Woods. He testified concerning the circumstances surrounding the Blake Interview. Defense counsel noted a standing objection to Sergeant Bennett's testimony about the content of the interview and objected again when the State introduced the Blake Interview into evidence. Defense counsel's objections were overruled, and the Blake Interview was admitted into evidence and published to the jury.[9]

---

[9] The State also introduced the testimony of five other witnesses. Detective Burley Williams and Sergeant Banks, both with the Wicomico County Sherriff's Office, testified about their participation in the surveillance of the enterprise, corroborated Detective Kirkland's testimony concerning the purchases, and established the chain of custody for the purchases that were sent for laboratory analysis. On the second day of trial, the State called Detective Andrew Riggin, who testified that he obtained the search and seizure warrant and then conducted the raid on the house. His testimony primarily related to the layout of the house and the items that were seized. He also testified that during the surveillance, he saw Respondent at the house approximately four times, but that he saw Mr. Woods and Mr. Blake there more often. Jessica Bullis, a forensic chemist, testified that she performed the laboratory testing of the suspected narcotics received from the controlled purchases and that her testing revealed the presence of heroin and fentanyl. She also identified the CDS that were seized in the raid, which

16

After the State rested, Respondent moved for a judgment of acquittal as to all counts. The circuit court granted the motion as to counts 6 (conspiracy to distribute fentanyl), 21 (possession of more than 28 grams of heroin), 22 (possession of more than 5 grams of fentanyl), 23 (conspiracy to possess more than 28 grams of heroin), 24 (conspiracy to possess more than 5 grams of fentanyl), and 25 (conspiracy to possess more than 28 grams of heroin), but denied the motion as to the remaining counts.

Respondent testified in his own defense. He testified that he had known Mr. Blake since the early- to mid-1990s and that they were friends. He explained that he knew Mr. Woods through Mr. Blake and was aware that they both sold drugs. Although Respondent admitted that he had previously been convicted of certain drug-related felonies, including heroin distribution, he consistently denied that he had any involvement with Mr. Woods's drug sales. Respondent testified that he did not live at the house in which the raid took place, but he visited from time-to-time to take Mr. Blake to his medical appointments. He explained that he was at the house on the night of the raid because he was taking care of Mr. Blake and was going to drive his mother-in-law for a family trip. Respondent testified that none of the ammunition or drugs that were seized during the raid belonged to him.

---

included heroin, fentanyl, cocaine, and alprazolam. Lastly, Michael Daugherty, a special investigator for the Wicomico County State's Attorney's Office, was qualified as an expert in drug valuation, identification, investigations, and the common practices of users and dealers of CDS and drugs. He testified to the street value of the seized evidence and to the organizational structure of the drug enterprise.

After the defense rested, Respondent again moved for a judgment of acquittal, arguing that the State had failed to prove a necessary element of the drug kingpin charges, specifically, the threshold amount of heroin and fentanyl. The court granted the motion as to count 12 (possession with intent to distribute alprazolam), but denied the motion as to the remaining counts.

Thereafter, the jury found Respondent guilty on twelve counts—counts 30 through 33 (possession of CDS other than marijuana) and counts 34 through 41 (conspiracy to possess CDS other than marijuana). Respondent was either acquitted by the court or found not guilty by the jury of the remaining 30 counts.

The court imposed four one-year sentences for the CDS possession charges (counts 30–33) to be served consecutively. Moreover, after merging the eight conspiracy convictions into four (counts 34–41), the trial judge imposed one-year sentences for each. Since the sentences for the conspiracy convictions were to be served concurrently with the sentences for the possession convictions, however, Mr. Smith's aggregate sentence was four years of incarceration. The court granted Respondent credit for time served from his arrest in the raid on August 9, 2019.

### D.     *The Appellate Court of Maryland*

Respondent timely appealed his convictions to the Appellate Court of Maryland. He argued that the trial court erred by admitting the Blake Interview in its entirety as a declaration against penal interest without undertaking the parsing analysis required by *Matusky*. The Appellate Court agreed with Respondent and held that "the trial court erred by admitting the *entire* version of the Blake interview offered by the State under the

18

statement against penal interest exception to the hearsay rule set forth in Maryland Rule 5-804(b)(3) without parsing the narrative and redacting those portions not genuinely self-inculpatory as to Mr. Blake." *Smith v. State*, 259 Md. App. 622, 632–33 (2022) (emphasis in original).

The Appellate Court held that under *Matusky*, the trial court "needed to inquire whether each of the statements in the Blake Interview was truly self-inculpatory." *Id.* at 633. The court held that while some statements could be deemed equally inculpatory of Mr. Blake and Respondent, "other statements could not be considered genuinely inculpatory of Mr. Blake because they merely served to shift blame for the present workings of the enterprise." *Id.*

Relevant to the issue now before us, the Appellate Court rejected the State's preservation argument.[10] While the court recognized that it is generally "the obligation of the party seeking redaction to raise the issue to the judge," it concluded that "the present case is ultimately governed by *Matusky*[.]" *Id.* at 670–71. The Appellate Court rejected the State's harmless error argument and vacated Mr. Smith's convictions.[11]

---

[10] Additionally, the Appellate Court held that Respondent waived any argument as to whether the admission of the Blake Interview violated his confrontation rights under the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights, as his objection to its admission was contained to the Maryland Rules. *Smith v. State*, 259 Md. App. 622, 646–67 (2023). Lastly, the Appellate Court held that "the State presented sufficient corroborating circumstances to permit the admission of portions of the Blake Interview[,]" as required by Maryland Rule 5-804(b)(3). *Id.* at 667. These issues are not presently before this Court.

[11] On August 24, 2023, the State filed a motion for reconsideration in light of this Court's decision in *Woodlin v. State*, 484 Md. 253 (2023), which was published the same

Thereafter, the State filed a petition for writ of *certiorari* asserting that the Appellate Court erred in holding that Respondent adequately preserved his objection to the trial court's failure to undertake the process for admission of this particular type of hearsay evidence.

## II

## Standard of Review

This case involves a circuit court's admission of hearsay statements that were part of an extended narrative or interview that the State sought to introduce at trial pursuant to the declaration against penal interest exception under Md. Rule 5-804(b)(3). Our case law establishes a process that a trial court must undertake before admitting this particular type of evidence. The State contends that the Appellate Court erred in its interpretation of our case law, and in doing so, "created a new exception" to "the general rule[,]" that the State asserts arises under case law, that imposes a duty on the opponent of the admission of the evidence to request redaction in order to properly raise a "failure-to-redact" claim. Where an issue involves the application of Maryland case law, we determine whether the lower court's conclusions are legally correct under a de novo standard of review. *Plank v. Cherneski*, 469 Md. 548, 569 (2020).

---

day as the Appellate Court's decision in this case. The Appellate Court denied the State's motion.

## Discussion

Before turning to the State's preservation argument, we provide an overview of the declaration against penal interest exception to the hearsay rule, as well as the particular process that a trial court is required to undertake when considering the statements contained within an extended interview or narrative in this context—a process that *uniquely* applies *only* to this particular type of hearsay evidence.

### A.      *Hearsay and the Declaration Against Penal Interest Exception*

Hearsay is "a statement,[12] other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). Hearsay is inadmissible "[e]xcept as provided by [the Maryland R]ules or permitted by applicable constitutional provisions or statutes[.]" Md. Rule 5-802. In *State v. Galicia*, 479 Md. 341, 354 (2022), we explained that the default exclusion of hearsay is premised on the theory

> that out-of-court statements are subject to particular hazards. The declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener. And the ways in which these dangers are minimized for in-court statements—the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and, most importantly, the right of the opponent to cross-examine—are generally absent for things said out of court.

---

[12] Maryland Rule 5-801(a) provides: "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."

*Id.* (quoting *Williamson*, 512 U.S. at 598).  Thus, hearsay is presumptively inadmissible evidence.  If, and only if, the proponent for the admission of the hearsay satisfies the requirements of one of a myriad of exceptions to the general exclusion rule, can it be admitted at trial.  *Curtis v. State*, 259 Md. App. 283, 314 (2023) ("It is well-established in our jurisprudence that hearsay will be *excluded*, unless the *proponent* demonstrates its probable *trustworthiness* by establishing that a recognized exception to the rule against admissibility is applicable." (emphasis in original) (citations omitted)); *see also, e.g.*, Md. Rules 5-802.1 through 5-804.

One such exception is the declaration against penal interest, which allows for the admission of certain out-of-court statements that have the tendency to expose the declarant to criminal liability.  Even prior to the codification of the Rules of Evidence in Title 5 of the Maryland Rules of Procedure in 1994, we long recognized this exception. *See, e.g.*, *Aetna Cas. & Sur. Co. v. Kuhl*, 296 Md. 446 (1983); *Merrick v. State*, 283 Md. 1 (1978); *Thomas v. State*, 186 Md. 446 (1946).  This exception is based on the general premise that "persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true."  *State v. Standifur*, 310 Md. 3, 11 (1987) (quoting Fed. R. Evid. 804(b)(3) advisory committee's note); *see also West v. State*, 124 Md. App. 147, 166 (1998) ("The rationale for admission of [declarations against penal interest] is that there is a circumstantial guarantee of sincerity when one makes a statement adverse to one's interest." (citations omitted)); Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 802[E] (5th ed. 2020) ("This exception is based on the

theory that it is unlikely that a person will make a false statement that could be used to bring about . . . a loss of liberty.").

This exception, now codified as Maryland Rule 5-804(b)(3), requires the declarant to be unavailable,[13] and provides that the following is "not excluded by the hearsay rule":

> A statement which was at the time of its making so contrary to the declarant's . . . proprietary interest, so tended to subject the declarant to . . . criminal liability, . . . that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

For a statement to be admissible under Rule 5-804(b)(3), the proponent of the evidence has the burden to demonstrate, and the trial court must determine that "(1) the declarant is unavailable, (2) the statement is genuinely adverse to the declarant's penal interest, and (3) corroborating circumstances clearly indicate the trustworthiness of the statement." *Galicia*, 479 Md. at 359.

Some statements that appear to be against the declarant's penal interest are actually ones for which the declarant may reap the most benefit—specifically, statements that inculpate *both* the declarant and another person. This Court and the United States Supreme Court have recognized that a hearsay statement that implicates a codefendant is particularly unreliable:

> [W]e must treat as "inevitably suspect" a statement made to persons in authority and implicating a codefendant, even though the statement also

---

[13] A declarant is unavailable if he or she, among other things, "is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity[.]" Md. Rule 5-804(a)(4).

contains an admission of the declarant's culpability . . . . A defendant implicating his confederate may do so to curry favor with the authorities, to achieve a plea bargain, to shift the blame by showing that another was more culpable, or simply to have another with whom to share the blame.

*Standifur*, 310 Md. at 13 (quoting *Cruz v. New York*, 481 U.S. 186, 1990 (1987)). Because of this inherent unreliability, when determining whether a statement is sufficiently self-inculpatory to qualify under the exception, the court should consider "the content of the statement in the light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant." *Id.* at 17.

### B. *The Trial Court's Duty to Parse Each Statement in a Narrative*

The United States Supreme Court and this Court have held that when a proponent seeks to admit an extended declaration or narrative under the declaration against penal interest exception to the hearsay rule—such as the extended narrative in the Blake Interview—it may not be admitted without evaluating *each statement* and excluding those that do not inculpate the declarant. *See Williamson*, 512 U.S. at 600 (holding that, under the federal rule analogous to Md. Rule 5-804(b)(3), the trial court erred by admitting the entire declaration without determining whether each statement was inculpatory of the declarant); *Matusky*, 343 Md. at 485, 491 (holding that a statement-by-statement analysis was required under the common law and Md. Rule 5-804(b)(3) and adopting *Williamson* as a persuasive interpretation of Maryland law). As we explain below, when presented with an extended hearsay narrative, these cases require that the trial court analyze *each statement* to determine whether a reasonable person in the

24

declarant's position would have believed it to be adverse to their penal interest when the declarant made it, "determin[ing] the separate admissibility of each single declaration or remark." *Matusky*, 343 Md. at 492 (quoting *State v. Mason*, 460 S.E.2d 36, 45 (W. Va. 1995)) (cleaned up). Although our decision in *Matusky* is the most recent articulation of the process that the trial court is required to undertake, we summarize cases that preceded it as we adopted the framework established in those cases.

### *State v. Standifur*

In *Standifur*, which was decided prior to the adoption of Title 5 of the Maryland Rules, we addressed the necessity of parsing each self-inculpatory part of a larger hearsay narrative for the first time. 310 Md. 3 (1987). In that case, a declarant-witness who had illegally purchased a gun that was used in a burglary gave a statement to law enforcement. *Id.* at 6–7. At trial, the declarant-witness was unavailable, and a state trooper was permitted to recount his statements as declarations against penal interest. *Id.* at 8. The Appellate Court of Maryland reversed, and this Court affirmed that decision. *Id.* at 9.

After explaining the rationale of the declaration against penal interest exception to the hearsay rule, we explained that "[i]nculpatory statements may be divided into collateral and noncollateral statements." *Id.* at 15. Noncollateral statements are those "in which the facts inculpating the defendant are found in the portion of the statement directly against the declarant's interest." *Id.* at 15–16. By contrast, collateral statements are those "in which the inculpatory material is not found in the portion of the statement

25

directly against the declarant's interest, but instead appears in another portion of the statement." *Id.* at 16.

We then outlined the process for analyzing the admissibility of a hearsay statement offered as a declaration against penal interest. *Id.* at 17. In its opinion below, the Appellate Court succinctly summarized the analytical test that we set forth in *Standifur*, which we can summarize no better:

> (1) *Unavailability*. The trial court must find that the declarant is unavailable to testify at trial.
>
> (2) *Penal Interest/Nature of the Statement as Whole*. The trial court—considering "the content of the statement in the light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant"—must "determine whether the statement was in fact against the declarant's penal interest and whether a reasonable person in the situation of the declarant would have perceived that it was against his penal interest at the time it was made."
>
> (3) *Reliability*. The trial court must then "consider whether there are present any other facts or circumstances, including those indicating a motive to falsify on the part of the declarant, that so cut against the presumption of reliability normally attending a declaration against interest that the statements should not be admitted."
>
> (4) *Final Inquiry/Parsing*. Finally, "a statement against interest that survives this analysis, *and* those related statements so closely connected with it as to be equally trustworthy, are admissible as declarations against interest."[14]

*Smith*, 259 Md. App. at 659–60 (quoting *Standifur*, 310 Md. at 12, 17) (emphasis omitted in part) (footnote omitted). Applying this framework, this Court concluded that the

---

[14] As we discuss herein, *Matusky* modified this fourth step pertaining to "collateral statements." Under *Matusky*, each statement in the narrative is required to satisfy the admissibility requirements.

26

declarant-witness's statement should not have been admitted into evidence because the evidence was insufficient to prove that a reasonable person in his position "would have understood the disserving nature of the statement[,]" and "the totality of circumstances under which the statement was made militate[d] against a finding of the requisite reliability." *Standifur*, 310 Md. at 17.

*Williamson v. United States*

A few years later, in *Williamson v. United States*, the Supreme Court considered the admissibility of a codefendant's partially self-inculpatory statement as a declaration against penal interest under Federal Rule of Evidence 804(b)(3). 512 U.S. 594 (1994). There, the declarant, Harris, was arrested after he was discovered with a large quantity of cocaine in the trunk of his rental car. *Id.* at 596. During an interview with law enforcement officers, Harris indicated, among other things, that the cocaine belonged to Williamson and that Harris was simply a courier. *Id.* at 596–97. Williamson was subsequently charged with various drug offenses. *Id.* At Williamson's trial, Harris refused to testify and, thus, the trial court permitted one of the officers who interviewed Harris to testify as to Harris's statements, concluding that they were admissible under Fed. R. 804(b)(3). *Id.* at 597–98. The United States Court of Appeals for the Eleventh Circuit affirmed, but the Supreme Court reversed, concluding that the statements were not properly admitted. *Id.* at 598.

The Court narrowly construed the word "statement" contained in the rule to mean "a single declaration or remark," as opposed to an extended declaration or narrative. *Id.* at 599. The Court explained that "the most faithful reading of Rule 804(b)(3) is that it

27

does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Id.* at 600–01. The Court went on to state that there was "no reason why collateral statements, even ones that are neutral as to interest . . . should be treated any differently from other hearsay statements that are generally excluded," and the only consideration is whether each statement in the broader narrative is itself a statement against the declarant's penal interest. *Id.* The Court emphasized that a trial court "may not just assume[,] for purposes of" the rule,

> that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else. "[T]he arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence."

*Id.* at 601 (quoting *Lee v. Illinois*, 476 U.S. 530, 541 (1986)).

As applied to Williamson's case, the Court determined that while some portions of Harris's confession could be admissible under the Rule as sufficiently self-inculpatory, others would not be, "especially the parts that implicated Williamson, [but] did little to subject Harris himself to criminal liability." *Id.* at 604. Because the record demonstrated that neither the trial court nor the Court of Appeals "inquired whether each of the statements in Harris' confession was truly self-inculpatory[,]" the Court remanded the case to the Court of Appeals "to conduct this inquiry in the first instance." *Id.* The Court observed that a court's analysis of each statement "can be a fact-intensive inquiry, which . . . require[s] careful examination of all the circumstances surrounding the criminal activity involved[.]" *Id.*

28

Justice Scalia concurred and wrote to expound his view that the statement against penal interest exception may properly cover statements that inculpate both the declarant and co-conspirator. *Id.* at 605–07 (Scalia, J., concurring). In his view,

> a declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible merely because the declarant names another person or implicates a possible codefendant. For example, if a lieutenant in an organized crime operation described the inner workings of an extortion and protection racket, naming some of the other actors and thereby inculpating himself on racketeering and/or conspiracy charges, I have no doubt that some of those remarks could be admitted as statements against penal interest. Of course, naming another person, if done, for example, in a context where the declarant is minimizing culpability or criminal exposure, can bear on whether the statement meets the Rule 804(b)(3) standard. The relevant inquiry, however—and one that is not furthered by clouding the waters with manufactured categories such as "collateral neutral" and "collateral self-serving," . . . must always be whether the particular remark at issue (and *not* the extended narrative) meets the standard set forth in the Rule.

*Id.* at 606–07 (emphasis in original).

### *State v. Matusky*

Following *Williamson*, we returned to the issue of parsing in *State v. Matusky*, 343 Md. 467 (1996). We adopted *Williamson* and reconciled it with *Standifur*. In that case, the respondent was charged with two counts of first-degree murder. *Id.* at 470. His codefendant had previously confessed to his fiancée that the respondent committed the murder, but that he (the codefendant) was merely the getaway driver. *Id.* at 471. While the codefendant's fiancée initially told police that the codefendant was with her for the entire day of the murder, she recanted this statement and recounted the codefendant's statements to the police. *Id.* The respondent and the codefendant were ultimately charged with two counts of first-degree murder. *Id.* At the respondent's trial, the

29

codefendant asserted his Fifth Amendment right against self-incrimination and, thus, was an unavailable witness. *Id.* As a result, the trial court permitted the fiancée to testify as to what the codefendant told her about the events in question, finding that the declaration against penal interest exception applied. *Id.* at 471–72.

The Appellate Court of Maryland reversed, reasoning that the trial court should not have admitted the codefendant's statement in its entirety because portions of the statement were not self-inculpatory, especially those which identified the respondent as the killer and discussed his motive. *Matusky v. State*, 105 Md. App. 389, 403 (1995). We agreed with the Appellate Court's analysis, affirmed its decision, and remanded the case for a new trial. *Matusky*, 343 Md. at 475–76, 492.

In our opinion, we relied heavily upon our opinion in *Standifur*, re-affirming the framework that we outlined in that case. *Id.* at 479–83. We explained that the "final inquiry" under *Standifur*'s declaration against penal interest analysis requires "that the trial judge parse the entire declaration to determine which portions of it are directly contrary to the declarant's penal interest, and which collateral portions are so closely related as to be equally trustworthy." *Id.* at 482. Applying this standard, we held that "the trial court erroneously admitted [the fiancée]'s testimony *in toto* rather than analyzing the declaration statement by statement to determine whether collateral portions of [the codefendant's] account should be redacted." *Id.* at 485. We explained that "the trial court should have redacted those portions of [the codefendant's] declaration identifying [the respondent] as the murderer and suggesting [the respondent's] motive for the crime" because those "portions of the declaration did not directly incriminate" him

30

and simply "serve[d] to shift blame from [the codefendant] to [the respondent]." *Id.* Thus, "[b]ecause the trial court failed to properly analyze [the codefendant's] hearsay declaration," we reversed the respondent's convictions. *Id.*

Because the respondent's trial on remand would be governed by the newly effective Maryland Rules, including Rule 8-403(b)(3), we also discussed *Williamson*. Although we noted that it was merely persuasive authority insofar as it interpreted federal evidentiary procedure, we "adopt[ed] it as part of Maryland law, in accord with a number of other states." *Id.* at 489–90. In adopting *Williamson*, we recognized that our *Standifur* framework needed tweaking. We observed that "[t]he central distinction between the *Williamson* approach and our approach in *Standifur* is that 'proximity' between the self-inculpatory and 'collateral' portions no longer guarantee[d] admissibility." *Id.* at 491. We recited with approval the Delaware Supreme Court's observations in connection with that court's adoption of *Williamson*:

> [T]here is no theoretical basis for the admission of neutral, collateral statements. Hearsay statements are generally inadmissible. . . . A hearsay declaration is admissible, usually under a specific exception only where the declaration has some theoretical basis making it inherently trustworthy. *See Ohio v. Roberts*, 448 U.S. 56, 63 (1980). Thus, absent some special indicia of reliability and trustworthiness, hearsay statements are inadmissible. *Neutral, collateral statements enjoy no such guarantees of reliability and trustworthiness. Williamson*, 512 U.S. at 600.

*Id.* (emphasis in original) (some internal citations omitted) (quoting *Smith v. State*, 647 A.2d 1083, 1088 (Del. 1994)).

Instead, in parsing each constituent portion of the larger narrative, "[t]he test for admissibility to be applied to each statement within a declaration is whether a reasonable

31

person in the declarant's circumstances would have believed the statement was adverse to his or her penal interest at the time it was made." *Id.* at 492. Collateral proximity, in and of itself, no longer suffices.

Against this framework, we turn to the State's preservation argument.

## C.     *Parties' Contentions*

The State argues that the Appellate Court erred by "creating an exception" to the general rule that a defendant is required to request redaction in order to properly raise a "failure to redact" claim on appeal. The State directs the Court to treatises reflecting the general rule that when a party seeks redaction of a prior statement or piece of evidence, the party must request one where a general objection is overruled. *See* Lynn S. McLain, *Maryland Evidence* § 103:8 (3rd ed. 2013) (noting that "if one's general objection is overruled, one must request redaction of the objectionable part, in order to complain on appeal of the court's failure to redact"); Joseph F. Murphy, Jr. & Erin C. Murphy, *Maryland Evidence Handbook* § 105[B] (5th ed. 2020) (advising practitioners that "[i]f your objection gets overruled, request that the court exclude specific portions which would easily be redacted"). The State points out that this Court applied this principle in *Woodlin v. State*, 484 Md. 253 (2023), and the Appellate Court has applied it in *Colkley v. State*, 251 Md. App. 243, 282–83 (2021), *Belton v. State*, 152 Md. App. 623, 634 (2003), and *Williams v. State*, 117 Md. App. 55, 68 (1997).

The State asserts that "[b]efore and during trial, defense counsel did not try to obtain a lesser remedy by asking the circuit court to 'parse' the interview and redact particular parts while admitting other parts." The State asserts that because defense

counsel failed to request redaction of those portions of the Blake Interview that he contends were inadmissible, we should hold that he failed to preserve his objection to the admissibility of the Blake Interview.

According to the State, the Appellate Court erred by "creating an exception to the general rule" by incorrectly interpreting *Matusky* as placing a duty on the trial court to parse the narrative. The State also asserts that *Matusky* neither said that the trial court has a duty to redact *sua sponte*, nor did it say that a trial court must parse the narrative upon specific request. For this reason, the State asserts that this Court should "resolve this issue the way Maryland courts have resolved similar areas of law, by requiring specific preservation in order to preserve the failure-to-redact claim for appeal." Because defense counsel did not request that the trial court redact particular statements within the Blake Interview, the State argues that Respondent failed to preserve his objection to the trial court's process for admitting the interview in its entirety.

Respondent argues that the Appellate Court's opinion did not create a new preservation exception, and that it correctly recognized that the "general rule" espoused by the State does not apply because *Matusky* governs the admission of this particular type of hearsay evidence. Respondent points out that *Matusky* imposes a duty on the trial court, which requires the court to parse each statement as part of the process for determining the admissibility of hearsay statements comprising an extended narrative when considering the declaration against penal interest exception.

Respondent contends that the State interjects confusion into the analysis by referring to the Blake Interview as a "statement," as the trial court did, which makes it

sound like one thing to be admitted or excluded. According to Respondent, following this incorrect framework, the State erroneously characterizes this evidence, for preservation purposes, as a "statement" or a "piece of evidence" for which Respondent was obligated to seek redaction, instead of a series of statements, which, under this Court's case law, were required to be parsed by the trial court to determine *which statements* were admissible. When considered within the correct framework, Respondent asserts that it becomes clear that the cases cited by the State in support of a "general rule" governing "prejudicial details of otherwise admissible evidence, as opposed to separately inadmissible statements," are not controlling. Respondent contends that, under the State's argument, the Court would be creating a "new duty" upon "defense counsel to conduct the trial court's parsing for it."

> **D.** **The Appellate Court Correctly Interpreted Our Case Law Concerning the Trial Court's Duty to Parse an Extended Declaration Against Penal Interest**

We determine that the Appellate Court did not err in its analysis of *Matusky*, or in holding that Respondent preserved his objection to the trial court's failure to undertake the parsing analysis required by our four-part test for determining whether this particular type of hearsay evidence is admissible.

As discussed above, *Matusky* established a process for admission that the trial court is *required* to undertake when determining the admissibility of a hearsay statement pursuant to the declaration against penal interest exception set forth in Maryland Rule 5-804(b)(3). This test is unique to this particular type of hearsay evidence. The issue that Respondent raised before the Appellate Court was the trial court's failure to undertake

34

the final step in the process. Specifically, when confronted with an extensive declaration, narrative, or interview involving more than one "statement," the trial court cannot treat the declaration as a single "statement" that is to be admitted or not admitted as a whole but is required to undertake a parsing analysis. *Matusky* makes clear that the "*trial court must break down the narrative and determine* the separate admissibility of each 'single declaration or remark.'" 343 Md. at 492 (emphasis added). In doing so, *Matusky* further mandates that "[t]he test for admissibility to be applied to each statement within a declaration is whether a reasonable person in the declarant's circumstances would have believed the statement was adverse to his or her penal interest at the time it was made." *Id.*

We are far from alone in imposing a duty upon the trial court to parse hearsay narratives prior to the admission of purported statements against penal interest. The federal circuits that have ruled on the issue after *Williamson* have held that the district court has this duty. *See, e.g.*, *United States v. Mendoza*, 85 F.3d 1347, 1352 (8th Cir. 1996) ("*Williamson* required the district court to examine each portion of [the] statement to determine whether it tended to subject [the declarant] to criminal liability."); *United States v. Castelan*, 219 F.3d 690, 694 (7th Cir. 2000) (stating that under "*Williamson*, the district court *must* consider whether each statement, not just the confession as a whole, was truly self-inculpatory" (emphasis added)); *United States v. Canan*, 48 F.3d 954, 959 (6th Cir. 1995) (stating that "when ruling upon a narrative's admissibility under this rule, *a court must break it down* and determine the separate admissibility of each 'single declaration or remark.' This exercise is 'a fact-intensive inquiry' that requires 'careful

35

examination of all the circumstances surrounding the criminal activity involved'" (quoting *Williamson*, 512 U.S. at 599, 604) (emphasis added)); *United States v. Ojudun*, 915 F.3d 875, 886 (2d Cir. 2019) (holding that the district court erred by "not focus[ing] on each of his statements individually to determine which of them would reasonably have been viewed as so exposing him to criminal liability as to fall within Rule 804(b)(3)(A)"). Similarly, state supreme courts that have adopted *Williamson* have been clear that the trial judge has the duty to remove non-self-inculpatory statements from the longer narrative before its admission. *See, e.g.*, *Idaho v. Robins*, 431 P.3d 260, 275 (Idaho 2018); *West Virginia v. Kaufman*, 711 S.E. 2d 607, 622–23 (W. Va. 2011); *Minnesota v. Ford*, 539 N.W. 2d 214, 227 (Minn. 1995); *Massachusetts v. Marrero*, 800 N.E.2d 1048, 1050 (Mass. 2003); *Osborne v. Kentucky*, 43 S.W.3d 234, 241 (Ky. 2001); *Washington v. Roberts*, 14 P.3d 713, 726 (Wash. 2000).

The State asserts that these cases do not address preservation and, therefore, are not dispositive of the issue it presents here—whether defense counsel was required to seek redaction of particular statements in order to preserve his objection that the trial court failed to engage in the parsing process. Respondent agrees, but counters that it is equally notable that, in all of the cases that the State cites, the appellate courts not only considered the merits of the defense counsel's objection, but they also failed to hold, or even mention, that the opponent of the hearsay narrative had a duty to seek redaction in order to raise the trial court's failure to undertake the parsing process on appeal. We agree with Respondent that if there was a duty on an opponent to seek redaction in order to raise the trial court's failure to undertake the parsing process appeal, there would be at

36

least a whiff of such duty referenced in these cases. And in at least one instance, a federal appellate court commented on the *proponent's* failure to raise parsing. *See Castelan*, 219 F.3d at 694 (stating "[h]ere, the record is silent on whether the district court considered whether each statement by [the declarant] introduced at trial was genuinely self-inculpatory, and *certainly the government never urged the district court to parse* [the declarant's] statements as *Williamson* required" (emphasis added)).

Of course, while we find these cases persuasive, we are not bound by them in determining the preservation requirement here. Turning to the Maryland appellate cases cited by the State, we disagree with the State that the general rule applied in those cases compels us to hold that defense counsel has a duty to seek redaction to preserve an objection to the trial court's failure to undertake the admission process here. The cases cited by the State involve different types of evidence with different admissibility considerations.

For example, *Woodlin* involved the admissibility of a prior sex offense under a statute that authorizes its introduction provided certain safeguards are met.[15] 484 Md. 253, 261–62 (2023). In that case, prior to trial, the State sought to admit portions of a defendant's guilty plea transcript concerning details of a prior sex offense. The defense argued pre-trial that the prior conviction should not be admitted because the prior offense was not sufficiently similar to the charged offense. *Id.* at 272–73. At trial, the defense

---

[15] One of the safeguards is that "[t]he defendant had an opportunity to confront and cross-examine the witness or witnesses testifying to the sexually assaultive behavior[.]" Md. Code Ann., Courts and Judicial Proceedings Article § 10-923(e)(2) (1984, 2021 Repl. Vol., 2022 Supp.).

argued only that the admission of the conviction would violate his right to confrontation. *Id.* at 275. On appeal, the defense argued for the first time that the admission of the plea transcript was more prejudicial than probative because it contained inflammatory details about the prior offense. We found the issue unpreserved because although the defense had been provided with the plea transcript on multiple occasions, they had never raised an issue about the unredacted transcript or objected to the scope of the evidence. *Id.* at 293–94.

Under the statute in question, the General Assembly imported a balancing test similar to the one found in Maryland Rule 5-403—which requires that the trial court determine whether the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Id.* at 277. We reviewed the trial court's application of the balancing test under an abuse of discretion standard. *Id.* at 268. Within this context—judgment calls involving otherwise admissible evidence—it is logical to require defense counsel to point out precisely what information he or she considers to be unduly prejudicial.

*Belton v. State*, 152 Md. App. 623 (2003) and *Williams v. State*, 117 Md. App. 55 (1997), each involved the admission of prior inconsistent statements by a witness at trial after the witness recanted on the stand. In *Belton*, the statements were admitted under two hearsay exceptions: as a prior inconsistent statement and as an extrajudicial identification, which the trial court admitted over defense counsel's objection. 152 Md. App. at 631–32. On appeal, the appellant asserted that the statements should not have been admitted into evidence because they were not inconsistent with the witness's trial

testimony, and they did not qualify as an extrajudicial identification because they consisted of "far more than a mere identification of appellant." *Id.* at 631. The Appellate Court held that the appellant had failed to preserve his objection of the admissibility of the hearsay evidence by not requesting a redaction or limitation of the portion of the tape that was played to the jury. *Id.*

Similarly, in *Williams*, after a witness recanted on the stand, the prosecutor introduced a "prior inconsistent statement" of the witness. 117 Md. App. at 67–68. On appeal, the appellant argued that the portions of the witness's statement that were *consistent* with his trial testimony should not have been admitted. *Id.* In that context, the Appellate Court determined that the "appellant made no objection below to the admission of the statement due to the fact that it included consistent statements[,]" and likewise "never asked the trial court to redact the portions of the statement appellant believed to be prior consistent statements." *Id.* at 68. The Appellate Court therefore determined that, "even if error, it was not preserved." *Id.*

In *Colkley v. State*, during the appellant's fifth murder trial (the first two trials having been reversed, and the second two trials having resulted in mistrials), his counsel objected to the State playing recordings of two co-conspirators' prior testimony who were both unavailable. 251 Md. App. 243, 278–79 (2021). The appellant's objections related to the "prejudicial nature" of both recordings and the inclusion of the phrase "ladies and gentlemen of the jury" at the beginning of one of them. *Id.* at 283. The Appellate Court determined that the appellant's general objections to the admission of the recordings were not preserved because he did not seek redaction of what he considered to be prejudicial

39

statements within the context of hearsay statements that were otherwise admissible. The Appellate Court concluded that the trial court did not abuse its discretion in failing to redact the phrase "ladies and gentlemen of the jury"—the only phrase that the appellant asked the trial court to exclude. *Id.* at 284.

Simply put, these cases did not involve the type of evidence that is in dispute here—an extensive hearsay narrative which is governed by a unique admissibility process under our case law that a trial court is required to undertake prior to the admission of that evidence. The trial court's parsing requirement to determine the admissibility of hearsay statements that comprise an extended narrative or interview based upon the declaration of penal interest exception *is unique* to this type of hearsay evidence. And there is a good reason for requiring that these types of statements undergo the rigor of such an analysis prior to their admission, particularly when the statement inculpates not only the declarant, but also a codefendant. As discussed above, we treat "as 'inevitably suspect' a statement made to persons in authority and implicating a codefendant" because a "defendant implicating his confederate may do so to curry favor with the authorities, to achieve a plea bargain, to shift the blame by showing that another was more culpable, or simply to have another with whom to share the blame."[16] *Standifur*, 310 Md. at 13 (citations omitted).

---

[16] To support its position that statements against penal interest should be treated the same as any other type of hearsay evidence, the Dissent relies upon *State v. Grant*, 776 N.W.2d 209 (N.D. 2009). Dissent Slip Op. at 12–14. In that case, the Supreme Court of North Dakota analyzed certain hearsay statements recorded by a nurse practitioner and their admissibility pursuant to North Dakota Rules of Evidence 803(4)

Like the Appellate Court, we determine that our case law does not impose a duty upon the opponent of an extended narrative interview to present the trial court with proposed redactions prior to the trial court undertaking its duty to parse the statement pursuant to the process established by *Matusky*.

The State identifies several policy reasons why this Court should place a duty on the opponent of the admission of the hearsay narrative to present the court with specific redactions of inadmissible statements. First, according to the State, the defense is far more familiar with the facts of the case and, thus, is better able to parse the statement in the first instance. Second, the State argues that "shifting the burden to the trial court" will require the trial court to "read defense counsel's mind" as to which specific parts should be redacted. Third, the State points out that a narrative may be long, thereby requiring the trial court to make "judgment calls" about each statement without "specific input from the defendant." The State argues that the failure to impose a duty on defense counsel to provide a redacted narrative will promote gamesmanship by creating a

---

(statements made for medical diagnosis or treatment) and 803(6) (records of a regularly conducted activity). *Grant*, 776 N.W.2d at 213–14. We do not find *Grant*'s discussion of those hearsay exceptions persuasive here. As discussed herein, statements against penal interest are unique and are treated as "inevitably suspect" for the reasons we described in *Standifur*, 310 Md. at 13 (citations omitted). We further note that had this case arisen in North Dakota, the Blake Interview would be inadmissible under that jurisdiction's rules of evidence, which provide that "[a] statement or confession offered against the accused in a criminal case, made by a codefendant or other person *implicating both the declarant and the accused*, is *not* within this exception." N.D. R. Evid. 804(b)(3)(B) (emphasis added); *see also* Editor's Note, N.D. R. Evid. 804 ("Such statements may not be against interest, and the area is one in which the constitutional rights of the defendant may preclude their admission. Rather than proceed on a case-by-case basis, it was decided to preclude admission of such statements entirely.").

41

disincentive for defense counsel to provide guidance to the trial court and hedge their bet on an "all or nothing" approach to the admission of the evidence. We disagree and further explain below how, if the *Matusky* process is undertaken correctly, these concerns will be addressed and eliminated.

### E. *The Trial Court's Duty and the Manner in Which Parsing Should Be Undertaken*

Where a proponent seeks the admission of presumptively inadmissible hearsay under the declaration against penal interest exception, the proponent should present evidence and argument to the trial court that: "(1) the declarant is unavailable, (2) the statement is genuinely adverse to the declarant's penal interest, and (3) corroborating circumstances clearly indicate the trustworthiness of the statement." *Galicia*, 479 Md. at 359. When presented with such a request, the trial court must analyze the admissibility of a hearsay statement offered as a declaration against penal interest under the following framework:

(1) *Unavailability*. The trial court must find that the declarant is unavailable to testify at trial.

(2) *Penal Interest/Nature of the Statement as Whole*. The trial court—considering "the content of the statement in the light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant"—must "determine whether the statement was in fact against the declarant's penal interest and whether a reasonable person in the situation of the declarant would have perceived that it was against his penal interest at the time it was made." *Standifur*, 310 Md. at 17.

(3) *Reliability*. The trial court must then "consider whether there are present any other facts or circumstances, including those indicating a motive to falsify on the part of the declarant, that so cut against the presumption of

42

reliability normally attending a declaration against interest that the statements should not be admitted." *Id.*

(4) *Parsing*. "When ruling upon the admission of a narrative under this rule, a trial court must break down the narrative and determine the separate admissibility of each single declaration or remark. The test for admissibility to be applied to each statement within a declaration is whether a reasonable person in the declarant's circumstances would have believed the statement was adverse to his or her penal interest at the time it was made." *Matusky*, 343 Md. at 492 (cleaned up).

As to the fourth step, the trial court "may not assume" "that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else." *Williamson*, 512 U.S. at 601. Moreover, "[n]eutral, collateral statements enjoy no such guarantees of reliability and trustworthiness[]" and are, therefore, not admissible "absent some special indicia of reliability and trustworthiness[.]" *Matusky*, 343 Md. at 491 (quoting *Smith*, 647 A.2d at 1088).

We agree with the Supreme Court's observation that the trial court's analysis of each statement "can be a fact-intensive inquiry," which requires "careful examination of all the circumstances surrounding the criminal activity involved[.]" *Williamson*, 512 U.S. at 604. Although we hold that the opponent has no *duty* to propose redactions of statements contained in an extended narrative prior to the trial court undertaking the process, that does not mean that either a proponent or an opponent of the narrative or interview may not *request* redaction. Moreover—addressing the State's policy concerns—a trial court has no obligation to consider the admissibility of the statements in isolation or without soliciting input or requesting proposed redactions from both parties. The trial court can look at the narrative with the parties present, consider input from the

parties on each statement, and can request that the parties help redact individual statements within the narrative. What the court cannot do is treat the narrative as a single statement without considering whether each statement within it is in fact self-inculpatory to the declarant.[17]

Indeed, if the trial court undertakes the process required by *Matusky*, it prevents the concerns expressed by the State that a party will engage in gamesmanship by failing to object or hedging their bets when the party thinks there may be a particular strategic benefit by failing to object. We can envision circumstances in which the proponent of the evidence argues that *all* of the statements are admissible and, conversely, an opponent argues that *none* of the statements are admissible—which was done here. Because the trial court is required to consider the admissibility of each statement within a narrative, the process *removes* uncertainty on appeal. Once the trial court undertakes its duty and parses the narrative to determine the admissibility of each statement, the party objecting

---

[17] The Dissent asserts that our approach "risks taking control of the case away from the parties, placing the court in a role usually filled by the advocates and potentially undermining the parties' abilities to put on their cases." Dissent Slip. Op. at 6. Under the Dissent's view, the circuit court's duty to parse "could limit the ability of the parties to allow certain hearsay into evidence, and, in a criminal case, it could hamper a defendant's ability to put on a defense." *Id.* at 8. We disagree. *First*, as outlined herein, the circuit court is not required to undertake the parsing analysis without input from the parties or proposed redactions by the parties. Nothing requires the parsing to be undertaken by the court in isolation. *Second*, we are not suggesting that the circuit court is *required* to exclude hearsay statements where the parties stipulate or agree to the statement's or statements' admissibility. There may be good reasons for the defendant to want an otherwise inadmissible statement to come into evidence. In such an instance, the defendant can stipulate as to its admissibility. In other words, where the parties stipulate or agree to the admissibility of a statement or statements, the court's hands are not tied—it is not required to supplant an agreement amongst the parties with its own admissibility determination.

to the admission of that statement, or any part of it, must still object to that statement.[18]

In other words, nothing in our opinion should be construed as suggesting that traditional waiver principles do not apply once the trial court undertakes the parsing process, or where there is no objection to a trial court's failure to undertake the parsing process in the first instance. When the trial court considers each statement in connection with the aforementioned duty, a party opponent's failure to object to a statement's admissibility will be subject to traditional waiver principles.

### F.    *Respondent Adequately Preserved His Challenge to the Hearsay Evidence at Issue*

Based upon our review of the record, we hold that Respondent adequately preserved his objection to the trial court's failure to undertake the process required for the admission of this particular type of hearsay evidence.

In the prosecutor's motion to admit the evidence, he explained that the trial court had to determine whether "the recorded interview" "qualifies as a statement against interest." Although the prosecutor correctly pointed out that the trial court was required to undertake the parsing analysis required by *Matusky*, he did not attempt to explain how

---

[18] We are unpersuaded by the State's argument that there will be a risk of reversal if the trial court makes judgment calls without imposing a duty on defense counsel to provide redactions. As noted, the trial court may seek input, including proposed redactions from both parties prior to making the admissibility determination. In doing so, the trial judge will make the same judgment call that is necessarily required in any instance when deciding whether the standard for admission has been satisfied. Whether evidence is admissible under a hearsay exception is a legal conclusion reviewed de novo, while any factual findings underpinning that legal conclusion are reviewed for clear error. *Gordon v. State*, 431 Md. 527, 538 (2013). Where a trial judge makes an erroneous judgment call in this context, it is subject to the harmless error analysis.

each statement satisfied the admission standard. Instead, the prosecutor treated the narrative as a single statement—summarizing the 55-minute interview containing over 250 statements in a single paragraph:

> [W]ithin Mr. Blake's statement, he describes in specific and nuanced detail how he would sell amounts of controlled dangerous substances and how the organization operated. This information included how much Mr. Blake was to be paid in the organization, that he was given a phone to use by the [Respondent] in order to received orders for controlled dangerous substances, how [Respondent] would coordinate drug transactions that Mr. Blake would effect, where the controlled dangerous substances came from, the amount of money for which Mr. Blake would sell certain amounts of controlled dangerous substances, and information related to the inner-workings of Defendant's drug trafficking operation.

Although the prosecutor mentioned the parsing requirement again, he urged the court to admit the Blake Interview in its entirety because "the statements that contain inculpating statements relating to Mr. Blake are so interwoven with the statements that inculpate [Respondent] that they cannot be severed," and also argued that the statements could not "be sanitized and separated."

Defense counsel filed a response objecting to the introduction of the Blake Interview. One of defense counsel's objections was that the claimed "interwoven" statements were not against Mr. Blake's interest and implicitly averred that they were severable. The defense criticized the prosecution for "attempting . . . to get statements made by [Mr. Blake] that implicate the defendant into evidence *as if* they are statements against interest." Defense counsel also parsed one of Mr. Blake's statements to illustrate that the statements were not "so interwoven."

46

The circuit court considered the parties' competing arguments at a pre-trial hearing. The court noted that it had watched the 55-minute interview. The court asked whether there was a "case on point" that addressed a scenario in which part of the "statement" is "against [Mr. Blake's] interest, but part of it is a statement against [Mr. Smith's] interest." The prosecutor admitted that "there are definitely parts of the statement that are solely against [Mr. Blake's] own interest and solely against [Respondent's] interest, but I think there is a lot of portions of the interview that the statement is against both their interests simultaneously and they are so closely interwoven that you couldn't possibly separate the two." The prosecutor then read part of Justice Scalia's concurrence in *Williamson* in support of his position that the entire Blake Interview was admissible because the statements were so interwoven that they were not severable. The prosecutor did not discuss any particular statement or statements or show how they were self-inculpatory to Mr. Blake. It is clear that the prosecution was trying to convince the trial court that the statements were not severable and that the Blake Interview should simply be admitted into evidence *in toto*.

Defense counsel continued objecting to the manner in which the State was attempting to admit the Blake Interview. In addition to arguing that Mr. Blake's statements were confusing because they were not connected to a particular time frame and that his client would be prejudiced by his inability to cross-examine Mr. Blake, defense counsel stated that he did not agree with the prosecution's argument that the statements were "so interwoven" that they inculpated both Mr. Blake and the

47

Respondent. Defense counsel gave another example of a statement that would not be self-inculpatory as to Mr. Blake:

> If this witness says my client did run a drug organization at some point, handed the reins over to Dwight Woods, and Dwight Woods took it over and then Dwight Woods started dealing drugs, which is why this investigation began, that's what scares me.

Defense counsel made a similar argument in the context of reliability, stating:

> [Mr. Blake] can inculpate himself as much as he wants that the State's argument [is] correct, most people who inculpate themselves tend to tell the truth when they do that. It's when they push everything off on someone else, oh, I was just the low man on the totem pole, he was the one who got the drugs from Baltimore and brought them here.

After hearing arguments of counsel, the trial court ruled that the Blake "statement" could come in. In its ruling, the court treated the Blake Interview as one statement for hearsay purposes, simply stating that "the Court would note that Justice Scalia's concurrence does seem to be on point. So the Court is going to grant the State's request to allow the statement to be heard." It is clear that the trial court believed that it could treat the statement as one piece of evidence that could be admitted and, thus, made its ruling notwithstanding defense counsel's attempts to explain how the statements were not all self-inculpatory and so interwoven that they could not be separated.

Defense counsel objected to the admission of the entirety of the Blake Interview again during the trial, prior to the trial court admitting the interview. The circuit court granted Mr. Smith a standing objection, but defense counsel noted that he was going to object once again before the video of the interview was played to the jury, to ensure that "everything is preserved." When the prosecution moved to admit the Blake Interview

48

into evidence, defense counsel again objected, which the circuit court overruled. Based upon these objections, we determine that defense counsel adequately preserved his argument that the trial court failed to undertake the process required by *Matusky* for admission of this particular type of hearsay evidence.

## IV

## Conclusion

For the foregoing reasons, we hold that the Appellate Court correctly determined that Mr. Smith preserved his objection to the trial court's failure to undertake the necessary process required by our case law when considering the admission of hearsay statements contained within an extended interview or narrative under the declaration against penal interest exception. We affirm the judgment of the Appellate Court.

**JUDGMENT OF THE APPELLATE COURT AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

IN THE SUPREME COURT

OF MARYLAND

No. 30

September Term, 2023

_____

STATE OF MARYLAND

v.

LAMONT SMITH

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Hotten, Michele D.
   (Senior Justice, Specially Assigned),

JJ.

_____

Dissenting Opinion by Biran, J.

_____

Filed: August 13, 2024

Respectfully, I dissent.

In its opinion, the Majority adopts a "unique" procedure that applies only to admitting evidence under the statement-against-penal-interest exception to hearsay. Maj. Slip Op. at 3. Applying that procedure here, the Majority concludes that hearsay objections implicating this exception are preserved as to every single statement in a recorded 55-minute interview that the State introduced at trial – even though the defense only specifically objected to a single statement in the interview at trial and the trial court sustained the objection.[1]

This is an odd result. In all other contexts, an objection to evidence must be made when the evidence is offered (or as soon as the grounds for objection become apparent), otherwise the objection is waived. Md. Rule 4-323(a). This means that a party opponent generally must challenge particular hearsay statements, either by pointing them out to the court or by raising an objection when they are offered as evidence. To be sure, a continuing objection was secured at trial here, but this does not make the result less unusual. Continuing objections only apply to matters "clearly" within their scope. Md. Rule 4-323(b). And the continuing objection here was based upon arguments the defense made

---

[1] Like the Majority, I refer to this interview as the "Blake Interview." At trial, the defense argued that one statement in the Blake Interview, made by one of the officers questioning Mr. Blake, should be stricken because it was hearsay within hearsay and "not a statement against penal interest[,]" further explaining that "I just don't want that statement to come in." In response to this specific objection, the circuit court ordered the statement by the officer stricken and instructed the jury to disregard it.

at an earlier motion *in limine* hearing, where the defense similarly did not point the circuit court to any specific statement in the Blake Interview.

The Majority does not explain why the traditional procedure for objections – which continues to apply to all other objections grounded in hearsay and its other exceptions – is inadequate in the context of statements against penal interest, nor does the Majority name any benefits that would come with adopting a different process "that *uniquely* applies *only* to this particular type of hearsay evidence." Maj. Slip Op. at 21 (emphasis in original). Because I perceive that the Majority's procedure has several drawbacks and provides no corresponding benefits, I would instead apply our traditional preservation analysis and hold that the hearsay objections here were not preserved.

## A. The Legal Framework of Hearsay and Preservation

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). Hearsay is presumptively inadmissible, and a hearsay statement only will be admitted if it falls within an exception to the hearsay rule. *See* Md. Rule 5-802. Of course, there are also "a myriad of exceptions" to the rule, Maj. Slip Op. at 22, one of which concerns statements against penal interest. These are statements that "so tend[] to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." Md. Rule 5-804(b)(3).[2]

---

[2] For a statement to be admissible under Maryland Rule 5-804(b)(3) as against the declarant's penal interest, the proponent of the evidence must demonstrate "(1) the

2

Of course, not all statements that tend to subject a declarant to criminal liability are truly statements against penal interest. For instance, a declarant may admit some responsibility in the course of trying to pass greater responsibility onto somebody else. Although some commentators advocate generally admitting all those collateral statements too, *see* 5 J. Wigmore, Evidence in Trials at Common Law § 1465, at 339-41 (Chadbourn rev. 1974 & 1996 Supp.), I agree with the Majority that a more nuanced analysis applies in Maryland. Specifically, our analysis requires "separat[ing] the self-serving from the disserving portions of the declaration ..., excluding only the self-serving portions." *State v. Matusky*, 343 Md. 467, 479 (1996). That is not to say that no collateral statements can come in under the hearsay exception, but such collateral statements must be "so closely connected" with a statement against penal interest "as to be equally trustworthy[.]" *State v. Standifur*, 310 Md. 3, 17 (1987).

As the Majority correctly notes, we assess hearsay and its exceptions at the statement level, meaning that different statements within a larger narrative will not necessarily be treated the same way in a hearsay analysis. Thus, a trial court generally cannot shortcut the analysis by lumping multiple statements together in a larger narrative and making only a narrative-level ruling on hearsay. Likewise, in analyzing a particular statement, a trial court cannot refuse to consider context for the statement that is provided elsewhere in the larger narrative. Thus, we have said that a "trial judge [must] parse the

declarant is unavailable, (2) the statement is genuinely adverse to the declarant's penal interest, and (3) corroborating circumstances clearly indicate the trustworthiness of the statement." *State v. Galicia*, 479 Md. 341, 359 (2022).

entire declaration to determine which portions of it are directly contrary to the declarant's penal interest, and which collateral portions are so closely related as to be equally trustworthy." *Matusky*, 343 Md. at 482.

In practice, as hearsay and its exceptions are assessed at trial, a party opposing the admission of hearsay must generally object as the evidence is offered, objecting to each question that is posed to elicit objectionable hearsay or to each answer that contains it. *See State v. Robertson*, 463 Md. 342, 366 (2019); *see also Kelly v. State*, 392 Md. 511, 541 (2006) ("[I]t is incumbent upon the State to make the objections to the testimony as it is elicited by the defense."). Although a party may also object to an entire line of questioning by seeking a continuing objection, *Robertson*, 463 Md. at 366 ("[A] party should object to each question or assert a continuing objection to an entire line of questioning."), a continuing objection is effective only as to "questions clearly within its scope." Md. Rule 4-323(b).

Requiring a proper objection serves multiple functions. The objection is the mechanism for a party to hold the proponent of evidence to its burden. *See Curtis v. State*, 259 Md. App. 283, 314 (2023) ("The proponent of the evidence bears the burden of proving that the statement, and the circumstances under which it was made, fall within the confines of an applicable [hearsay] exception."). The objection also preserves the evidentiary issue for appellate review. *See* Md. Rule 5-103(a)(1) (noting that a party cannot assert error unless they were prejudiced by a ruling admitting evidence and either made "a timely objection or motion to strike" on the record); *Young v. State*, 234 Md. App. 720, 740 (2017) (admitted evidence can only create an appellate issue if "a timely objection or motion to

4

strike appears of record") (cleaned up). Conversely, without a timely objection, evidence may come in that otherwise would not, *see Kelly*, 392 Md. at 532 ("[H]earsay is only excluded upon an objection to it."), and the evidentiary issue generally will not be preserved for appellate review. *See* Md. Rule 8-131(a); *Taylor v. State*, 381 Md. 602, 614 (2004) ("Even errors of Constitutional dimension may be waived by failure to interpose a timely objection at trial[.]") (cleaned up).

This usual procedure benefits the trial court, the parties, and our judicial system. By requiring timely objections to preserve evidentiary issues, trial objections will generally occur at the statement level, "allow[ing] the trial court to prevent mistakes or cure them in real time." *Hall v. State*, 225 Md. App. 72, 89 (2015) (internal quotation marks and citation omitted). By requiring the parties to bring issues to the trial court's attention, our traditional preservation procedure ensures that other parties and the court can consider and respond to challenges, a proper record will be made, and the trial court will have a fair opportunity to correct its errors and to ask for more information about objections to particular questions or statements. *See Malarkey v. State*, 188 Md. App. 126, 157 (2009). Requiring timely objections also promotes fairness by preventing parties from "treating the trial as a sport" by waiting to object "until it may be too late for the other party to recover[.]" *Hall*, 225 Md. App. at 89 (internal quotation marks and citation omitted); *see also Bruce v. State*, 328 Md. 594, 628 (1992) ("Counsel cannot wait to see whether the answer is favorable before deciding whether to object.") (citation omitted).

Moreover, the usual procedure ensures that the parties have the freedom to pursue their case strategies, and – when they opt to challenge the admission of evidence – that they

will be motivated to present their best evidentiary arguments to the court. In the hearsay context, objections generally will be required at the statement (or question) level, ensuring that the hearsay analysis naturally proceeds statement-by-statement. For each statement or potential statement, the opponent will be able to decide whether to simply allow the statement in, or whether to object and, if necessary, explain why they believe the statement or question is improper. Absent objection, the trial court generally will allow the parties to put on their cases as they see fit. And when there is an objection, the trial court has the benefit of timely argument at the statement level to inform its evidentiary rulings.

**B. The Majority's Approach Upends the Traditional Procedure, Creating the Potential for Problems Without Providing Any Benefits.**

The Majority's novel approach toward preservation in this case creates new problems, without providing any new benefits. Under the Majority's new procedure, a party need only make a single, general challenge to a narrative as a whole by claiming that it contains hearsay that does not fall within the statement-against-penal-interest exception. In response, the court then must parse the *entire* narrative and exclude any statements that do not fall within that exception. Maj. Slip Op. at 40-41. A harmless error analysis will apply at the appellate level, but apparently only if the circuit court satisfies its duty to parse the narrative and *sua sponte* make "judgment calls" at the statement level about whether to exclude qualifying hearsay. Maj. Slip Op. at 45 n.18. And regardless, as with all hearsay determinations, each of the circuit court's statement-level rulings will be subject to *de novo* review. As a result, this new procedure has several drawbacks:

6

*First*, the Majority's procedure risks taking control of the case away from the parties, placing the court in a role usually filled by the advocates and potentially undermining parties' abilities to put on their cases. The Majority concludes that circuit courts have an independent duty to review narratives and exclude hearsay that does not fall within the statement-against-penal-interest exception. But by imposing this duty on trial courts, the Majority's analysis impinges upon an important power that ordinarily belongs to the parties: the power not to object to certain inadmissible hearsay.

Hearsay is frequently allowed into evidence, and there are times when the parties affirmatively want it to come in. *See Carter v. Aramark Sports & Ent. Servs., Inc.*, 153 Md. App. 210, 231 (2003) ("[M]uch hearsay, even inadmissible hearsay, is relevant and material.") (quoting *United States v. Spiller*, 261 F.3d 683, 689-90 (7th Cir. 2001)); *see also Kelly*, 392 Md. at 532 ("[H]earsay is only excluded upon an objection to it. It may be very relevant."). Among other things, hearsay can provide helpful background as well as important context to other statements in a larger narrative.[3]

---

[3] In this same vein, many attorneys routinely choose not to object to objectionable evidence, including hearsay, when the evidence does not appear to be harmful. *See, e.g.*, Steven Lubet, *Objecting*, 16 Am. J. Trial Advoc. 213, 220 (1992) ("When considering whether to object, counsel should always ask: 'Will the exclusion of the evidence contribute to my theory[?]' ... 'Do not object to anything that doesn't hurt you.'"); Jonathan J. O'Konek, *To Object or Not Object, That is the Question: A Criminal Law Practitioner's Guide to the "Five Ws" of Evidentiary Objections*, 95 N.D. L. Rev. 155, 178 (2020) ("[I]f opposing counsel simply asks a question which elicits hearsay, but is not harmful to the practitioner's case, he or she should not object.").

Additionally, and more to the point here, some inadmissible hearsay in an interview introduced by the State may well help the defense.[4] Consider repeated efforts by a declarant to pass off responsibility that ends up casting doubt on the declarant's own credibility, or that suggests an alternative suspect who appears to be more culpable. A defendant may well decide not to object to that sort of hearsay. But under the Majority's procedure, the circuit court would have a duty to exclude such hearsay during a parsing review. The Majority notes that a party could stipulate to the admissibility of a statement that was excluded during parsing, which would serve a similar function to not objecting to the statement under our traditional procedure for other hearsay exceptions. However, although the Majority explains that a court is "not required to supplant an agreement amongst the parties with its own admissibility determination[,]" Maj. Slip Op. at 44 n.17, the Majority seems to leave open the possibility that the court may decide to carry out its duty to exclude qualifying hearsay by rejecting such a stipulation. This possibility could limit the ability of the parties to allow certain hearsay into evidence, and, in a criminal case, it could hamper a defendant's ability to put on a defense.

*Second*, the Majority's approach is likely to cause confusion in our trial courts. In essence, the Majority expands a circuit court's duties. A circuit court must rule upon hearsay issues generally, but now it must also *identify* and rule upon certain hearsay issues.

---

[4] Indeed, defense counsel here perceived that some of the statements in the Blake Interview were exculpatory of Mr. Smith. Thus, defense counsel told the motions court: "I'll be honest with Your Honor, I spent a lot of time going back and forth as to whether I should just allow this in.... I went back and forth."

Usually, identifying evidentiary issues and requesting a ruling is a task for the parties. It is unclear how much the Majority is changing that usual division of responsibility. The Majority opinion is clear enough that, once the duty to parse is triggered, a circuit court must review a larger narrative in detail and *sua sponte* exclude hearsay statements that implicate but do not satisfy the against-penal-interest exception. However, the Majority opinion does not explain how far courts should go in parsing these narratives and excluding hearsay. For instance, when courts notice hearsay during parsing that does *not* seem to implicate the against-penal-interest exception, must they *sua sponte* exclude it too?[5] What if the against-penal-interest exception is implicated, fails, the statement at issue is redacted by the court, but another hearsay exception might arguably apply? Must trial courts review

---

[5] For instance, one could imagine hearsay statements in an interview that a court (especially without input from the defense) would conclude do not relate to matters of culpability/penal interest. These sorts of statements might simply be garden variety hearsay, they might fall within some other hearsay exception, or, if they do implicate penal interest, the court might not know enough about the case to understand that to be so. The Majority indicates that the "parsing requirement" only applies to "hearsay statements ... based upon the declaration of penal interest exception[.]" Maj. Slip Op. at 40. So, as I understand it, the Majority seems to be saying that trial courts should affirmatively determine whether to exclude hearsay in a narrative only if that hearsay implicates the against-penal-interest exception, and should otherwise leave potential hearsay alone (unless a party requests specific redactions). But there also appears to be room for differing interpretations of the Majority's language and fact-specific views about whether the against-penal-interest exception is implicated. Plus, the idea that trial courts should parse narratives to independently exclude only some types of hearsay could be challenging to put in practice, especially when more than one potential hearsay exception could be implicated by a given statement. *See Aetna Cas. & Sur. Co. v. Kuhl*, 296 Md. 446, 456 & 456 n.2 (1983) (noting, in a case with multiple defendants, "the all too common error of failing to distinguish between an admission and a declaration against interest" with respect to hearsay determinations).

even clearly irrelevant portions of lengthy interviews to exclude hearsay, or can they focus their limited time on only those portions that seem potentially relevant?

*Third*, placing the duty on the court both to identify and rule upon certain evidentiary issues creates troubling incentives. A party could, in theory, have an incentive to manipulate the procedure created by the Majority by: (1) making a general objection to a lengthy narrative (as to all hearsay in the narrative that is not against penal interest) at a motion *in limine* hearing; and (2) during the parsing process, arguing to exclude those hearsay statements that seem actually disadvantageous, and strategically providing no help in identifying any other specific hearsay statements that should be excluded. This would allow the party to minimize the chances that damaging statements will be admitted into evidence, while also maximizing the chances that the court will mistakenly admit hearsay that seems less damaging. Then, at trial, if the party can secure a continuing objection to the narrative on the basis discussed at the motion *in limine* hearing, it will create an appellate issue out of *every* hearsay statement erroneously admitted – regardless of whether the party included any argument on those statements or even mentioned them during the motion *in limine* hearing.[6]

*Fourth*, the Majority's approach is not a good use of judicial resources. Our traditional procedure incentivizes the parties to hone their disputes for the circuit court to

---

[6] To be clear, the record of this case in no way suggests that the defense was attempting to game its hearsay challenges to create appellate issues or was attempting to mislead the motions court into treating the Blake Interview as an all-or-nothing question of admission for tactical reasons.

resolve, and it tends to require evidentiary rulings only about statements that the parties genuinely dispute. However, the Majority's approach requires the circuit court to review lengthy narratives in the first instance and make rulings about every statement within. The onus is also on the circuit court to coordinate with the parties when questions inevitably arise, including fundamental (and difficult) questions concerning the scope of the circuit court's duty to *sua sponte* exclude certain hearsay statements but not others. Challenging hearsay questions might not even be important to a case, but the Majority's procedure requires our circuit courts to address such questions anyway. In effect, lengthy narratives that implicate the against-penal-interest hearsay exception are transformed into homework assignments for our circuit courts.

Additionally, because the Majority's approach also creates an incentive for a party to avoid being helpful – especially when a given hearsay statement does not seem particularly damaging – the Majority's approach will discourage continuing objections at trial. That is, courts will be naturally less inclined to grant continuing objections to hearsay issues that were decided at the *in limine* stage, because the party opposing the statements might never have brought any particular statements to the circuit court's attention or made specific arguments at the statement level. Thus, the Majority's approach also hampers a mechanism that saves time and makes trials less cumbersome.

Given these downsides, one might expect the Majority to explain why its unique approach to preservation in this context is warranted. The Majority's explanation, to the extent it provides one, is unconvincing. The Majority acknowledges the "general rule" in Maryland that an opponent must seek specific redaction when its general objection to a

11

narrative is overruled. The Majority then observes that the cases applying this general rule "involve different types of evidence with different admissibility considerations[,]" Maj. Slip. Op. at 37, rather than "the type of evidence that is in dispute here – an extensive hearsay narrative which is governed by a unique admissibility process under our case law[.]" Maj. Slip Op. at 40. True enough. However, the Majority does not explain why the process that this Court spelled out in *Matusky* for deciding the *admissibility* of such a narrative requires a different approach as to *preservation*. Rather, the Majority appears to assume that this approach to preservation already exists in our case law. Thus, in essence, the Majority's reasoning seems to be that there is a unique approach to preservation here because our case law has created one, regardless of whether such an approach makes sense.

As the State points out, none of the cases that concern the resolution of hearsay containing statements against penal interest involved preservation, and the Majority acknowledges as much. *See* Maj. Slip Op. at 36. Nevertheless, the Majority responds that – even though the cases did not involve preservation – "there would be at least a whiff of [a duty to redact] referenced in these cases" if the opponent of evidence was required to make objections at the statement level for this hearsay exception. Maj. Slip Op. at 36-37. I do not find the silence in the cases as significant as the Majority. From my review of the cases, I see no indication that anyone raised the issue of preservation. In any event, even if some trial courts have conducted the parsing inquiry in the absence of any request from the opponent of the evidence to redact specific portions of the narrative, the Majority here for the first time says that circuit courts *must* do so. Because there are several downsides to this approach, I would instead apply the "general rule" that the Majority recognizes: an

12

opponent of evidence in Maryland typically must make specific evidentiary objections when its general objection fails, pointing out to the court which portions of a narrative or other evidence should be excluded. The proponent of the evidence will then be held to its burden. The Majority provides no sound reason why this particular type of hearsay warrants a different approach to preservation.

The other side of the coin is the Majority's failure to explain why its approach to preservation is *not* appropriate for other types of hearsay evidence. In this regard, *State v. Grant*, 776 N.W.2d 209 (N.D. 2009), is instructive. Grant was accused of sexually abusing his young daughter, K.D.J. After the allegations came to light, K.D.J. was examined by a nurse practitioner, who created a report of her findings. *Id.* at 211. That report included statements made by K.D.J. and her grandmother, among others. *Id.* The report included information documenting K.D.J.'s medical history and also reported statements that K.D.J. made to the nurse practitioner about the alleged abuse. *Id.* One of the grandmother's statements contained in the report concerned Grant: "[The grandmother] is not sure of what Dale Grant's (biologic father) health history is. She states that there is drug use but she is unsure of any other history." *Id.*

At a pretrial hearing, the State informed the defense and the court that it planned to offer the nurse practitioner's examination report into evidence. *Id.* at 212. The defense did not raise any objection at the pretrial hearing concerning the report; however, the defense objected to the admission of the report in its entirety at trial, arguing that the report contained hearsay that was not admissible under any exception to North Dakota's hearsay rule. *Id.* With respect to the exception for statements made for the purpose of medical

13

diagnosis, N.D. R. Evid. 803(4), defense counsel contended that the report should not be admitted because it "goes far beyond what's necessary for a diagnosis." *Grant*, 776 N.W.2d at 212. The trial court admitted the entire report over objection. *Id.* Grant was convicted.

On appeal, Grant challenged the admission of the nurse practitioner's report. The North Dakota Supreme Court affirmed. The Court concluded that many of the statements contained in the report fell under the exception for statements made for the purpose of medical diagnosis. *Id.* at 214-16. However, with respect to the grandmother's statement about Grant's drug use, the Court said:

> Grant's past drug use was arguably not relevant to K.D.J.'s diagnosis and treatment even if made in response to [the nurse practitioner's] questioning. *Grant could have requested the State redact this particular statement, and he had ample opportunity to do so* at the pretrial hearing and trial. By failing to request redaction, but rather requesting this Court overturn the criminal judgment, Grant *needlessly made the issue an all-or-nothing proposition.* Under the deferential standard of review for evidentiary matters, we decline to overturn the district court's decision to admit the entire nurse practitioner's report on the basis of this single questionable statement. *The normal remedy for an otherwise admissible document containing inappropriate information is redaction.*

*Id.* at 216 (emphasis added).

Under the "general rule" that applies in Maryland concerning preservation, if the same situation arose in Maryland, the result would be the same as it was in *Grant*. Like statements contained in a police interview of a suspect analyzed for admissibility under the against-penal-interest exception, some statements in a healthcare provider's report may fall within the hearsay exception for statements made for purposes of medical diagnosis or treatment, Md. Rule 5-803(b)(4), and some may not. If the trial court overrules a blanket hearsay objection to admission of the report – meaning that the court has determined that

14

at least some portion of the report is properly admissible – the trial court has no duty on its own initiative to review the report to determine whether there are any statements in the report that should be redacted because they do not fall under the Rule 5-803(b)(4) exception. However, if the opponent requests redactions, the trial court must consider and rule on those requests. If this general rule works for Rule 5-803(b)(4) – and for the many other situations in which some portions of proffered evidence may be admissible and others may be inadmissible – I see no logical reason, and the Majority has offered no such reason, why the general rule should not be applied when the evidentiary issue involves a narrative containing some statements that may be against the declarant's penal interest and other statements that may not fall within that exception.[7] Moreover, by not explaining why its new approach is appropriate only for the against-penal-interest exception to hearsay, the Majority appears to leave open the possibility that it will eventually be extended to other analogous situations and hearsay exceptions like those at issue in *Grant*, causing Maryland courts to reach a different result in the future.

In my view, the Majority misinterprets *Matusky* to mean that a trial court must engage in the parsing inquiry whether or not the opponent wants the court to do so, and whether or not the opponent has identified which parts of the narrative should be redacted.

---

[7] There is no logical connection between the suspicion we generally attach to suspects' statements to authorities and what a party should be required to do to preserve an objection to any particular out-of-court statement being admitted into evidence. While the tests that govern the application of specific hearsay exceptions vary depending on the types of hearsay at issue, it does not logically follow that the procedure regarding preservation should vary depending on the type of hearsay at issue.

The four-part test stated in *Matusky* provides a step-by-step approach to resolve disputes about what can be a very complicated hearsay determination: which parts of a declarant's narrative containing multiple statements are against the declarant's penal interest and which parts are not. The key word in the preceding sentence is "disputes." Implicit in the *Matusky* procedure is that there is an actual dispute between the parties as to whether any particular statement should be admitted or excluded. The only way a trial court knows if any statements are actually in dispute and, if so, which ones they are, is if the opponent objects on a statement-by-statement basis. Once the opponent does so, the duty to engage in parsing under *Matusky* arises.[8]

## C. The Majority's Attempt to Conform Its Approach to the Traditional Requirement of Preservation Does Not Solve Its Problems.

Perhaps realizing that its novel approach to this hearsay exception has downsides, the Majority attempts to walk it back in several respects. However, none of these attempts fully solves the new approach's problems, and they still leave troubling incentives in place.

---

[8] Seemingly implicit in the Majority's approach is the notion that, when a trial court overrules a party's blanket objection to a narrative being admitted as a statement against penal interest, the party will always believe that one or more of the individual statements in the narrative constitutes inadmissible hearsay and will want to have one or more of those statements excluded. But that may not always be the case. It may be that, after losing a blanket objection, the opponent will want all of the statements in the narrative to come in, rather than parsing the narrative. Perhaps the material that is helpful to the party will be contained only in statements that are inadmissible and all of the damaging material will be contained in the parts that are admissible. In other words, a party sometimes may prefer an all-or-nothing approach. Regardless, after a blanket objection is overruled, the general rule places the burden on the opponent to tell the trial court which parts of a narrative containing potentially inadmissible material the opponent is challenging, which is merely the flip side of telling the court which statements the opponent stipulates to being admitted.

16

The Majority's efforts to allay concern only show that its "unique" approach is unnecessary.

To defend its approach, the Majority emphasizes that it will not be so different from the traditional, familiar approach to other hearsay exceptions and other evidentiary issues. The Majority states that the circuit court may replicate, in part, the traditional approach by asking the parties to help determine whether hearsay is covered by the against-penal-interest exception, and by requesting proposed redactions from the parties. *See* Maj. Slip. Op. at 43-44 & 44 n.17. Alternatively, the parties can wait until the court has finished parsing and then decide whether to object to statements ruled admissible and stipulate to the admission of statements ruled inadmissible. Regardless, after the circuit court reviews an entire narrative for hearsay and decides which statements to admit, the opponent must still object at trial to the statements, as parsed, coming into evidence in order to preserve the issue. Maj. Slip Op. at 44-45. Thus, according to the Majority, the trial court ultimately "will make the same judgment call," Maj. Slip Op. at 45 n.18, that it would make if the opponent of the evidence had the onus to object (*i.e.*, request redactions) on a statement-by-statement basis after the opponent's blanket objection was overruled.

But these justifications provide more questions than answers. For starters, it is unclear why the Majority believes that the onus should be on the circuit court to ask for help in redacting hearsay related to the against-penal-interest exception, while at the same time the opponent of evidence must affirmatively provide their positions, statement-by-statement, when other hearsay exceptions (or other issues requiring excluding evidence) are implicated. It is also unclear why the Majority believes that the circuit court should go

17

through the extra effort of assessing hearsay across entire narratives, when the Majority at the same time believes that the process will ultimately be driven by stipulations and statement-level objections at trial and result in the same judgment calls anyway. Thus, the Majority's approach is puzzling. It adopts a new approach to preservation that applies only to one hearsay exception, fails to explain why the approach better adjudicates disputes about that exception, and then justifies its approach by arguing that it is not so different from traditional practice – or, at least, that it can be adapted to produce the same results as traditional practice with additional effort. If all that is true, why create a new approach?

Moreover, as discussed above, this new approach brings with it predictable problems, despite the Majority's efforts to conform its approach to traditional practice. Notwithstanding a trial court engaging in parsing, a defendant could create back-pocket appellate issues by keeping their assistance vague at the motion *in limine* stage whenever a given statement did not seem particularly damaging, and then requesting a continuing objection at trial on the basis of the general *in limine* objection. After this, the defendant would be assured that their hearsay objections were preserved as to every statement, leaving them free to object at trial only to statements that seemed truly harmful to the case – and to remain silent for all the other statements, saving them as appellate issues if the trial did not go their way.

And, if a hearsay statement implicates (but does not satisfy) the against-penal-interest exception, then a defendant who wanted to allow the hearsay statement into evidence without objection would need to stipulate to the statement's admissibility. Then, it appears, the court could decide whether to honor that stipulation, or instead to exclude

18

such hearsay anyway. Given that the Majority recognizes "[t]here may be good reasons for the defendant to want an otherwise inadmissible statement to come into evidence," Maj. Slip Op. at 44 n.17, it is not clear why the Majority does not apply our normal preservation approach to this context. Our general rule allows the defendant (or the State, if it is the party whose blanket objection has been overruled) effectively to stipulate to those statements in a narrative they want to be admitted by asking for the other statements to be redacted. The Majority's contrary approach, in my view, is inefficient and ill-advised.

Here, after the motions court overruled Mr. Smith's blanket objection to admission of the Blake Interview, Mr. Smith did not request that any individual statements in the Blake Interview be redacted, nor did he otherwise object to the admission of any of the individual statements in the Blake Interview at trial (except for objecting to one statement by an officer, which led the trial court to strike that statement). Under Maryland's longstanding and consistent approach regarding preservation, Mr. Smith failed to preserve any objection to the admission of the individual statements in the Blake Interview. I would affirm his convictions.